**OTIS EASTERN SERVICE, INC., Plaintiff,**

v.

**RAYTHEON ENGINEERS & CONSTRUCTORS, INC., Defendant.**

**No. 98–CV–6019.**

United States District Court, W.D. New York.

July 30, 1998.

Timothy Embser, Fmbser & Woltag, P.C., Wellsville, NY, for Otis Eastern Service, Inc., plaintiff.

Anthony R. Palermo, Hodgson, Russ, Andrews, Woods & Goodyear, Rochester, NY, Timothy Patrick Sheehan, Hodgson, Russ, Andrews, Woods & Goodyear, Rochester, NY, Jonathan M. Albano, James C. McCrath, Bingham Dana LLP, Boston, MA, for Raytheon Engineers & Constructors, Inc., defendant.

## DECISION AND ORDER

SIRAGUSA, District Judge.

This is a diversity action in which the plaintiff is suing to collect monies allegedly owed under a construction subcontract. Before the Court is a motion by the plaintiff for partial summary judgment. For the reasons stated below, this application is denied.

## BACKGROUND

This action involves a dispute between a general contractor and a subcontractor on a project to construct a natural gas storage facility near Avoca, New York. On or about May 7, 1996, the parties entered into a subcontract agreement which required the plaintiff, as subcontractor, to install a gas pipeline at the aforesaid gas storage facility. The subcontract agreement consists of a primary agreement and eighteen other "subcontract documents." The total amount due to the plaintiff upon completion of the project was to be 2.5 million dollars [1], with the defendant agreeing "to make monthly progress payments on account hereof as provided in Article 10 of the Subcontract General Conditions." That article states in relevant part:

INVOICING AND PAYMENT

Unless otherwise stated in the Agreement, Subcontractor shall:

10.1 Submit a monthly invoice by the third working day of the month covering progress on the Work during the previous calendar month, subject to approval by Contractor.

10.2 Be paid ninety (90%) of the approved amount of the monthly invoice within thirty (30) days of Contractor's receipt of payment therefore. *The remaining ten percent (10%) of each approved monthly invoice shall be withheld as retainage and paid to Subcontractor within thirty (30) days of Contractor's receipt of final payment from Owner less funds withheld by Owner, if any.* (Emphasis added).

To effectuate this provision, the plaintiff submitted to the defendant a detailed price breakdown setting forth a schedule of the amounts it would charge the defendant for each particular task to be performed. The defendant then agreed to make progress payments based on the scheduled amounts set forth in the price breakdown and the percentage of work completed as reported by the plaintiff in its invoices. Pursuant to Article 10.2 above, these progress payments were to be for ninety percent of the invoice amount, with the defendant holding back ten percent of each invoice amount as retainage.

The subcontract also contains the following provisions:

Article 8, Waiver of Liens

SUBCONTRACTOR, for itself, its lower-tier subcontractors, materialmen, laborers, and for all other persons performing any labor or furnishing any services, labor or materials for any of the work covered by this SUBCONTRACT, hereby waives, to the full extent permitted by law, all right to have filed or maintained any mechanics' or other liens or claims for or on account of the services, labor or materials to be furnished hereunder.

SUBCONTRACTOR (1) shall indemnify, and save harmless OWNER (and it's Partners, Plant Operator, etc.) and CONTRACTOR (and their employees) from all laborers', materialmen's, and mechanics' liens upon the real property upon which the Work is located arising out of the services and materials furnished by SUBCONTRACTOR, its lower tier subcontrac-

---

1. The parties later amended the lump sum payment due upon completion of the project to $2,522,640.83.

tors and others in connection with the Work, and (2) shall keep said property free and clear of all liens, claims, and encumbrances arising from the performance of this SUBCONTRACT by SUBCONTRACTOR, its lower tier subcontractors and others.

*Final payment will not be made by CONTRACTOR until a properly executed SUBCONTRACTOR'S Release and Certificate, Form 4003 has been received by CONTRACTOR. Said form should accompany the final invoice to ensure no delay in payment to SUBCONTRACTOR.*

(Emphasis added).[2] This Subcontractor's Release and Certificate form, Form 4003, was attached to and incorporated into the subcontract agreement. Although the contract provision relating to this release form is found under the heading "Waiver of Liens," the actual release pertains to much more than the release of any liens. The release form states that the subcontractor acknowledges that the contractor has fully performed and complied with the agreement, and that the subcontractor

[f]orever releases and discharges the Owner and Contractor of and from all claims, demands or causes of action, suits, debts, liabilities, controversies, damages and demands, whether in law or equity, contract or tort, which the Subcontractor, its successors and assigns, may now or hereafter have by reason of any matter, causes or thing whatsoever against the Owner or Contractor, their successors, or assigns, including, but not limited to. any and all claims and demands arising out of the Contract, or any changes therein or amendments thereto, or otherwise, in connection therewith.

In short, the release operates to release the Contractor and Owner not just from liability, for liens, but from any and all liability they may have to the subcontractor.

The subcontract agreement further states, in relevant part:

---

**2.** The defendant contends the term "final payment" refers to the payment of the retainage amounts: "Article 10.0 of the Subcontract General Conditions entitled 'Invoicing and Payment' discusses the procedure for payments under the

---

### DEFAULT, TERMINATION, AND SUSPENSION

\*    \*    \*    \*    \*    \*

13.5   Contractor shall have the right to suspend the Work upon advance, written notice to Subcontractor In the event of suspension: ... The duration of any such suspension shall not exceed one (1) year.

On or about May 7, 1996, the plaintiff began work on the gas pipeline. By letter dated August 9, 1996, the defendant informed the plaintiff that it was "temporarily suspending all project Work at the close of business on Friday, August 09, 1996." As of August 9, 1996, pursuant to Article 10 of the Subcontract General Conditions, the plaintiff had already sent three invoices to the defendant which the defendant paid, less the ten percent retainage. After work on the project was suspended, the plaintiff sent another invoice to the defendant, dated August 23, 1996. The defendant approved and paid this invoice, less the ten percent retainage. Then on January 13, 1997, the parties met to discuss further payments. Following that meeting, the plaintiff submitted its fifth invoice, dated January 15, 1997. The defendant approved and paid this invoice, less the ten percent retainage. It is undisputed that the total amount retained from the five invoices is $148,993.73. To date, the defendant has not paid any of this retained amount to the plaintiff.

Following payment of the fifth invoice, the plaintiff demanded payment from the defendant for additional amounts allegedly owed under the contract. The plaintiff alleges that it systematically understated the amount of work it had completed on the earlier five invoices at the insistence of the defendant, as a condition of being paid. The plaintiff contends that both sides were aware that the invoices were not accurate, and that because the defendant would not agree to pay the full amounts claimed to be due, the plaintiff submitted invoices for the amounts that the defendant would agree to pay at that time. In

---

Subcontract, including the timing of the *final retainage payment.*" (Affidavit of Timothy Sheehan, p. 4. emphasis added). This is not controverted by the plaintiffs.

short, the plaintiff alleges that it settled for receiving less than it was owed at the times of the various invoices, as a means of receiving at least part of what it was owed.[3] The plaintiff contends that as of the date of the fifth invoice, it still believed that work on the project would resume at some point and that it would eventually receive full payment upon completion of the project, thus it went along with the defendant's demands. Further, the plaintiff alleges that it agreed to waive certain amounts it was owed, on the condition that the project would be resumed at some point.

The construction project was never resumed, and the owner of the project filed for bankruptcy. Upon realizing that the project was in fact terminated, the plaintiff demanded full and final payment in accordance with the actual amount of work it believed it had performed, including amounts that it had earlier indicated it would waive if the project were resumed. The defendant denies that it owes any such additional amounts. The defendant alleges that the fifth invoice, which it paid, was intended to be a complete and final billing for all amounts owed under the contract, including any amounts owed in connection with the suspension and subsequent termination of the project. Accordingly, the defendant maintains that it has paid the plaintiff in full, less the retainage.

By letter dated August 15, 1997, the defendant wrote the plaintiff, inter alia, that "[p]ayment of the retention amounts to Otis will subsequently be made after receiving their final invoice for $148,994 *and an executed lien waiver form.*" (Emphasis in original). Of course, by executing the broadly-worded lien waiver form, the plaintiff would arguably be releasing the defendant from any further liability in connection with the contract. Therefore, while the defendant is offering to pay the retainage in exchange for receiving the release, as a practical matter, in so doing the plaintiff would be accepting the retainage in full settlement of its remaining claims in this action.

**3.** In a letter from the plaintiff to the defendant dated September 16, 1996, the plaintiff writes, in relevant part: "We have completed 81% of the

This action was commenced in New York Supreme Court, Allegany County, on December 22, 1997, and was removed to Federal Court on January 20, 1998. While the plaintiff's action seeks recovery for damages, as well as for payment of the retainage, the subject motion for partial summary judgment pertains only to the question of whether or not the plaintiff is presently entitled to payment of the retainage.

In its moving papers, the plaintiff contends that it is entitled to receive these retained monies now, without executing a release. because its invoices have been approved, the contract has effectively been terminated by the passage of time, and the limitations period for the filing of any mechanics' liens has now expired.

The defendant contends that the plaintiff is not yet entitled to receive the retained monies, because the plaintiff has not satisfied a condition precedent to payment, i.e. the execution of the aforementioned Subcontractor's Release and Certificate, Form 4003. Moreover, the plaintiff appears to concede that Article 8 of the subcontract establishes a condition precedent to payment. Mr. Anthony Deusenbery, the vice president of Otis Eastern, gave the following deposition testimony:

Q. Okay. Was there a lien waiver provision in this subcontract with Raytheon?
A. I believe there was.
Q. And it was a condition precedent to the final payment?
A. Most likely.

*   *   *   *   *   *

Q. Okay. Reading that paragraph [Article 8, last paragraph], is it your understanding that submission of a lien waiver is a condition precedent to final payment under the subcontract?
A. That's what it says.

However, despite the contractual language, the plaintiff argues that there is no reason for it to execute a lien waiver, because the limitations period for the enforcement of any liens would now be expired:

work and have received payment for only 22%. Your failure to honor the payment terms of our contract has caused us great financial harm."

§ 10 of the Lien Law provides that for a private project, a lien must be filed within 8 months after last working on the project. In the present case, work was suspended on 8/9/96 and two years have passed since work was done. There is no reason for Raytheon to be concerned with liens from creditors of Otis or for that matter from Otis itself

(Plaintiff's reply brief, p. 5).

The plaintiff is a New York corporation with a principal place of business in New York. The defendant is a Delaware corporation with a principal place of business in Colorado. The primary agreement states in relevant part that the subcontract "shall be interpreted in accordance with the substantive and procedural laws of the State of New York," while one of the subcontract documents ("Subcontract General Conditions") states that the subcontract is to be "governed by, construed and enforced in accordance with the laws of the State of South Carolina." However, in their submissions to the Court, the parties agree that the contract should be interpreted *according to the law of New York.*

## ANALYSIS

The standard for granting summary judgment is well established. Summary Judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is appropriate, a court must accept as true the allegations of the non-moving party, and should draw all factual inferences in favor of the non-moving party. *Wright v. Coughlin,* 132 F.3d 133, 137–138 (2d Cir.1998).

Summary judgment concerning the proper construction of a contract may be granted where the contract conveys a "definite and precise meaning absent any ambiguity." *Seiden Associates, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). In the case at bar, neither party contends that the contract is ambiguous, and the Court finds that the contract is unambiguous.

The Court finds that the resolution of this motion depends upon the question of whether or not Article 8 of the subcontract creates a condition precedent to final payment. The defendant contends that Article 8 makes the delivery of a release a condition precedent to payment. However, the plaintiff's motion papers devote little discussion to this issue.[4] While the plaintiff questions the necessity of a lien release at this point in time, due to the alleged expiration of the statute of limitations, it does not refute the defendant's contention that Article 8 creates a condition precedent to final payment. Therefore, the defendant's contention that a release is a condition precedent to payment is essentially uncontroverted.

In any event, the Court finds that Article 8 of the subcontract clearly does create a condition precedent to the plaintiff's right to final payment. Article 8 of the subcontract states in relevant part that payment

---

**4.** The plaintiff devotes more attention to its argument that paragraph 10.2 of the subcontract, set forth above, should be nullified pursuant to *West–Fair Electric Contractors v. Aetna Casualty, & Surety Co.,* 87 N.Y.2d 148, 158, 638 N.Y.S.2d 394, 661 N.E.2d 967 (1995), because that paragraph states that the retainage will be paid to the subcontractor "within thirty (30) days of Contractor's receipt of final payment from Owner less funds withheld by Owner, if any." *West–Fair* holds that "a pay-when-paid provision which forces the subcontractor to assume the risk that the owner will fail to pay the general contractor is void and unenforceable as contrary to public policy." *Id.* However, the plaintiff's reliance upon this holding is misplaced. First,

this is not a situation where the contractor is attempting to transfer the risk of nonpayment or default by the owner to the subcontractor. The defendant specifically states that it is willing to pay the retainage to the plaintiff, despite the fact that the owner has never made full payment to the defendant. Second, even if paragraph 10.2 were nullified, Article 8 of the subcontract still creates a valid condition precedent to payment. Finally, the Court would find that paragraph 10–2 is a "time for payment provision," not a condition precedent to payment, and therefore does not violate public policy. *See, Id.* Accordingly, the arguments of counsel relating to "pay-when-paid" provisions are not relevant to the issue before the Court.

"will not be made by CONTRACTOR until a properly executed SUBCONTRACTOR's Release and Certificate, Form 4003 has been received by CONTRACTOR. Said form should accompany the final invoice to ensure no delay in payment to SUBCONTRACTOR."

Clearly, this express language stating that payment will not be made until the release is executed creates a condition precedent. See, *Cayuga Construction Corp. v. United States*, 1994 WL 392233, *4 (S.D.N.Y. July 27, 1994); *See also, West–Fair Electric Contractors v. Aetna Casualty & Surety Co.*, 87 N.Y.2d 148, 155, 638 N.Y.S.2d 394, 661 N.E.2d 967 (1995). Since it is undisputed that this condition precedent has not been satisfied, the plaintiff is not presently entitled to payment of the retainage. Therefore, the plaintiff has failed to demonstrate that it is entitled to judgment as a matter of law.

## CONCLUSION

Accordingly, the plaintiffs motion for partial summary judgment [Document # 11] is denied.

So ordered.